IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF CALIFORNIA


| | | |
|---|---|---|
| LEWIS C. NELSON SONS, INC., | ) | No. CV-F-04-5577 REC/SMS |
| | ) | |
| | ) | ORDER DENYING PLAINTIFF'S |
| | ) | MOTION TO DISQUALIFY |
| | ) | MARSHALL C. WHITNEY, STEPHEN |
| Plaintiff, | ) | E. CARROLL, AND McCORMICK, |
| | ) | BARSTOW, SHEPPARD, WAYTE & |
| vs. | ) | CARRUTH AS COUNSEL |
| | ) | |
| COUNTY OF FRESNO, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

        On September 13, 2004, the court heard plaintiff Lewis C.
Nelson Sons, Inc.'s motion to disqualify Marshall C. Whitney,
Stephen E. Carroll, and McCormick, Barstow, Sheppard, Wayte &
Carruth as counsel for defendant County of Fresno.

        Upon due consideration of the record and the arguments of
the parties, the court denies this motion for the reasons set
forth herein.

        On April 16, 2004, Lewis C. Nelson Sons, Inc. filed a
Complaint against the County of Fresno.  Plaintiff alleged that

1

1  it is a corporation engaged in business as a duly licensed

2  building contractor.  The Complaint alleged that, on May 20,

3  2003, the County publicly advertised for bids for the

4  construction of the first phase of the Fresno Juvenile Justice

5  Center (the "Project").  Plaintiff submitted a bid, which bid was

6  opened on July 15, 2003.  Plaintiff was the low bidder on the

7  Project, but plaintiff was not awarded the contract because the

8  County claimed that plaintiff did not accurately describe the

9  location of one of its proposed subcontractors and failed to

10  provide further information within 24 hours.  The County

11  therefore found plaintiff's bid non-responsive and awarded the

12  bid to a competitor, whose bid was higher than plaintiff's.  The

13  Complaint alleged that, on other publicly advertised

14  solicitations for bids for public contract construction work, the

15  County has not applied the same rules to the low bidder.

16  Plaintiff alleges that the County has awarded the low bidder the

17  contract instead of finding the low bid to be non-responsive.

18  The Complaint alleged that the County treated plaintiff

19  differently than other contractors in retaliation for exercising

20  its First Amendment right to petition the government for redress

21  of grievances and in violation of the due process and equal

22  protection clauses of the Fourteenth Amendment.

23     By Order filed on August 31, 2004, the court granted in part

24  and denied in part the County's motion to dismiss and to strike,

25  ruling that plaintiff could amend the Complaint to allege the

26  deprivation of a constitutionally protected liberty interest

without due process of law, that the Complaint alleged a claim
for denial of equal protection of the law because of disparate
enforcement of the law in retaliation for the exercise of a First
Amendment right, and that lost profits are recoverable as damages
in an action pursuant to 42 U.S.C. § 1983.

Plaintiff now moves the court to disqualify Marshall C.
Whitney, Stephen E. Carroll, and McCormick, Barstow, Shepard,
Wayte & Carruth, as counsel for the County of Fresno in this
action.

A.   Factual Representations.

Dwight G. Nelson, president and sole shareholder of Lewis C.
Nelson and Sons, Inc. since its incorporation in 1979, avers in
pertinent part:

> 1.  In 1985, Lewis C. Nelson and Sons, Inc.
> began being represented by Oliver W. Wanger
> of McCormick, Barstow ... By about 1987,
> Marshall C. Whitney had become the principal
> attorney at McCormick, Barstow ... for Lewis
> C. Nelson and Sons, Inc., myself and my other
> business interests.  Marshall Whitney,
> assisted by, Stephen E. Carroll and his firm
> McCormick, Barstow ... were in essence, Lewis
> C. Nelson and Sons, Inc.'s general counsel,
> and general counsel for virtually all of my
> business interests, and were my attorneys for
> business, personal and family legal matters.
> Marshall Whitney would involve other
> attorneys at McCormick, Barstow ... when
> needed for their expertise, for example,
> Steven Rau for certain business and corporate
> matters, Mike Wilhelm for municipal law,
> Hilton Ryder for bankruptcy, and Don Black
> for real estate, and other attorneys.  This
> representation continued into 1996 with some
> matters continuing into 1997.
>
> 4.  Over the years that I and my companies
> were represented by Marshall Whitney and

3

1    McCormick, Barstow ..., I discussed with
     Marshall Whitney and McCormick, Barstow ...
2    the most confidential and secret aspects of
     my business and personal matters.  He was my
3    counselor and confidant.  The relationship
     was very close.  The relationship was so
4    close that Marshall Whitney also discussed
     many of his private personal matters with me.
5
     5.  Marshall Whitney advised me and Charles
6    Fletcher regarding how to look at and
     consider litigation and settlement, and the
7    methods and parts and pieces of legal
     matters.  We still do things as advised by
8    Marshall Whitney.  There has been no
     significant change in the corporate structure
9    of Lewis C. Nelson and Sons, Inc. since the
     time when Marshall Whitney, Stephen Carroll
10   and McCormick, Barstow ... represented us.

11   6.  Marshall Whitney and/or Stephen Carroll
     advised and worked with me and, [sic] Charles
12   Fletcher, controller of Lewis C. Nelson and
     Sons, Inc., regarding numerous bid protests
13   and claims involving public entities.
     Marshall Whitney counseled and represented
14   Lewis C. Nelson and Sons, Inc. as to issues
     involving overhead and profit, and I
15   discussed with him confidential and secret
     information regarding my and Lewis C. Nelson
16   and Sons, Inc.'s overhead and profit and
     planned strategies regarding overhead and
17   profit.  Overhead and profit are part of the
     damages being sought by Lewis C. Nelson and
18   Sons, Inc. in this lawsuit.

19   7.  During the years I was represented by
     Marshall Whitney and McCormick, Barstow ...
20   formed [sic] at least nine companies for me
     and one for my wife and myself.  McCormick,
21   Barstow ... were also corporate counsel to
     these corporations.  During the course of his
22   representation of Lewis C. Nelson and Sons,
     Inc., Marshall Whitney prepared me for
23   depositions and defended me in those
     depositions.  He prepared and defended me in
24   depositions in cases involving other business
     interests of mine, and did so once in a case
25   involving a corporation owned by Kathy
     Martin, the office manager of Lewis C. Nelson
26   and Sons, Inc.

4

8.   I placed the utmost trust and confidence in Marshall Whitney and McCormick, Barstow ..., sharing with them my, Lewis C. Nelson and Sons, Inc.'s, and my other businesses, confidential and secret planning, strategies, and litigation and settlement strategies and decision making.  I and other employees of Lewis C. Nelson and Sons, Inc. disclosed confidential and secret information regarding profitability and accounting of Lewis C. Nelson and Sons, Inc., and the relationship between myself and Lewis C. Nelson and Sons, Inc.  In representing Lewis C. Nelson and Sons, Inc., Marshall Whitney prepared me and we attended court settlement conferences.  He did the same for other business and personal interests of mine.  In once [sic] case not directly involving Lewis C. Nelson and Sons, Inc., Marshall Whitney discussed a [sic] length and counseled my wife and I regarding matters which were very upsetting to my wife and I.  Chuck Fletcher and I discussed in detail with Marshall Whitney alter ego arguments that had been raised.  Marshall Whitney and Stephen Carroll have confidential information about me and Lewis C. Nelson and Sons, Inc. and others at Lewis C. Nelson and Sons, Inc. that they could use against Lewis C. Nelson and Sons, Inc. in this case.

9.   Confidential and secret information was disclosed to Marshall Whitney and others at McCormick, Barstow ... based on the trust and confidence I had in Marshall Whitney.  Based on the years of representation and the close and intense relationship, this information could be used by Marshall Whitney in this case against Lewis C. Nelson and Sons, Inc. I believe that Marshall Whitney, Stephen Carroll and McCormick, Barstow ... have a conflict of interest and should not be allowed to represent the County of Fresno against Lewis C. Nelson and Sons, Inc. in this case.

Charles P. Fletcher, controller for Lewis C. Nelson and Sons, Inc. and of other businesses owned by Dwight Nelson since 1987 or when they were formed, avers that his duties include

5

1  finance, accounting, business and administration, including legal

2  matters.  Mr. Fletcher further avers in pertinent part:

3            2.  Lewis C. Nelson and Sons, Inc. is a
             general construction contracting company
4            whose business is performing public works
             building construction contracts, primarily in
5            the southern San Joaquin Valley; almost all
             of its contracts are with state or local
6            public entities, and some with the federal
             government.  Lewis C. Nelson and Sons, Inc.'s
7            financial livelihood is dependent on bidding,
             receiving and performing construction
8            contracts for public entities.

9            3.  When I arrived at Lewis C. Nelson and
             Sons, Inc. in 1987, Marshall Whitney of the
10           law firm McCormick, Barstow ... later
             assisted by Stephen E. Carroll, acted in the
11           role of general counsel to Lewis C. Nelson
             and Sons, Inc., to Dwight G. Nelson's other
12           businesses, and to Dwight G. Nelson
             personally, and continued as such until 1996.
13           Marshall Whitney was assisted by Stephen E.
             Carroll and other attorneys at McCormick,
14           Barstow ..., handled [sic] virtually all of
             the corporate, counseling, litigation and
15           other legal matters of Lewis C. Nelson and
             Sons, Inc., Dwight Nelson and Dwight Nelson's
16           other business interests, many if not most of
             which companies they incorporated.  Marshall
17           Whitney's representation on some matters
             continued into 1997.

18
             5. [sic] From 1987 until 1996, virtually all
19           legal matters of Lewis C. Nelson and Sons,
             Inc., including bid protests and claims
20           against public entities were handled by
             Marshall Whitney and/or Stephen E. Carroll of
21           McCormick, Barstow ... Sometimes Marshall
             Whitney would have associates or other
22           attorneys at McCormick, Barstow ... became
             [sic] involved, including Steven Rau, Michael
23           Wilhelm, Don Black, Hilton Ryder, Kenneth
             Baldwin, John Leonard, Kent Hamlin, Curt
24           Vogt, David McNamara, Tim Jones, Lawrence
             Artenian, Robert Hurlburt, Rachel Hill,
25           Patrick Foran, Jeffrey Reid, and W. Frederick
             Docker.  This representation occurred at a
26           particularly sensitive time because Lewis C.

                              6

Nelson and Sons, Inc. was growing, increasing from an annual gross revenue of about $5 million to $50 million during this period.

6.   Since about 1987, in addition to letters, faxes and telephone calls, and meetings on specific matters, because of the extensiveness of and number of matters Marshall Whitney and his firm were handling, we would have routine meetings with Marshall Whitney at McCormick, Barstow ...'s offices, usually about every six weeks.  Marshall Whitney was almost always at these meetings and there would be other McCormick, Barstow ... attorneys there, depending on what was going on at the time.  Dwight G. Nelson, myself, and Kathy Martin were almost always present.

7.   Marshall Whitney and Stephen Carroll of McCormick, Barstow ... represented Lewis C. Nelson and Sons, Inc. in connection with many bid disputes on public works construction projects including a women's prison in Madera ...; a California Highway Patrol facility at Felicity; a California Highway Patrol facility at Coalinga ...; section 801 housing at Castle Air Force Base; a housing project for the City of Fresno; a project at California State Prison - Avenal; and a California Highway Patrol facility at Atwater; they were involved in the bid itself on the City of Fresno housing project.  They were counsel as to claims and/or potential claims on construction contracts against the Greenfield Union Elementary School District, Clovis Unified School District, Selma Unified School District, Panama-Buena Vista Union School District, Greenfield Union School District, Standard School District, and Castle Air Force Base housing project.  They were involved in subcontractor matters and disputes on numerous public works projects including the above Greenfield, Selma, and Clovis projects, and Hanford Elementary School District.

8.   In representing Lewis C. Nelson and Sons, Inc., Marshall Whitney and Stephen Carroll learned about the actual and projected overhead of Lewis C. Nelson and

7

Sons, Inc., and its profits and projected profits and about its internal cost accounting.  Overhead and profit of Lewis C. Nelson and Sons, Inc. was involved in almost every representation by Marshall C. Whitney and Stephen E. Carroll regarding construction projects and disputes with public entities. Lewis C. Nelson and Sons, Inc.'s damages in this lawsuit include its overhead and lost profits.

9.  McCormick, Barstow ..., principally Marshall Whitney or other attorneys at McCormick, Barstow ... through Marshall Whitney, separately represented Lewis C. Nelson and Sons, Inc. in dozens and dozens of matters and represented Dwight Nelson and his other business interests in hundreds more. During the course of his representation, Marshall Whitney prepared me and defended me at depositions in lawsuits for Lewis C. Nelson and Sons, Inc., and for depositions involving other of Dwight Nelson's businesses.  Marshall Whitney, in representing Lewis C. Nelson and Sons, Inc. prepared Dwight Nelson and myself for court settlement conferences as representatives of Lewis C. Nelson and Sons, Inc.  Marshall Whitney, in representing other of Dwight G. Nelson's business interests, prepared Dwight Nelson and myself for private mediation and court settlement conferences.

10.  Dwight G. Nelson and myself disclosed to and discussed with Marshall Whitney and/or Stephen Carroll all aspects of Lewis C. Nelson and Sons, Inc., and Dwight G. Nelson's other businesses, including our thinking, planning, business strategies, litigation strategies, settlement thoughts, and the concepts and strategies of Dwight G. Nelson, and myself.  In representing Lewis C. Nelson and Sons, Inc., Marshall Whitney and Stephen Carroll learned completely about the organization, organizational structure and decision making of Lewis C. Nelson and Sons, Inc.  Throughout their representation of Lewis C. Nelson and Sons, Inc. and Dwight G. Nelson, Marshall Whitney and Stephen Carroll became intimately familiar with how we think, plan, and strategize, how we look at bids and

8

1    at litigation.  Dwight Nelson and I had
     lengthy discussions with Marshall Whitney
2    about claims and/or potential claims
     involving corporate alter ego.  Marshall
3    Whitney and Stephen Carroll have confidential
     and secret information adverse to Lewis C.
4    Nelson and Sons, Inc. in this lawsuit.

5    11.  The firm of McCormick, Barstow ... was
     paid some $2,000,000 for representation of
6    Dwight G. Nelson and his business interests
     between 1986-1996, of which approximately
7    $1,000,000 was regarding Lewis C. Nelson and
     Sons, Inc.

8
     12.  In late 1997 and early 1998, McCormick,
9    Barstow ... released its internal files
     regarding Lewis C. Nelson and Sons, Inc.,
10   Dwight G. Nelson and his other entities; I
     estimate there were some 100 boxes of
11   documents.

12   13.  Marshall Whitney and Stephen Carroll
     have a right to earn a living as lawyers, and
13   Fresno County should be able to chose who it
     wants to represent them; however, based on
14   the long and intimate relationship between
     Lewis C. Nelson and Sons, Inc. and its owner
15   and president, Dwight G. Nelson, with
     Marshall Whitney and Stephen Carroll, and the
16   confidential information shared with Marshall
     Whitney and his firm, and the confidence we
17   had in Marshall Whitney, I believe that
     Marshall Whitney, Stephen Carroll and their
18   law firm, have a conflict in this case
     representing the County against Lewis C.
19   Nelson and Sons, Inc.

20   Kathleen A. Martin, office manager for plaintiff since 1980,

21   avers in pertinent part:

22   2.  On September 24, 1985, Dwight G. Nelson,
     the president of Lewis C. Nelson and Sons,
23   Inc., and I met with Oliver Wanger of
     McCormick, Barstow ... regarding his
24   representing Lewis C. Nelson and Sons, Inc.
     He agreed and began representing Lewis C.
25   Nelson and Sons, Inc.  Shortly thereafter, he
     brought in Marshall C. Whitney ... who about
26   a year later assumed the role of our primary

9

1          counsel at McCormick, Barstow ....

2          3.  Beginning about 1987, we had routine
           meetings about every six weeks with Marshall
3          Whitney regarding the numerous matters he and
           his firm were handling for Lewis C. Nelson
4          and Sons, Inc. and other businesses owned by
           Dwight G. Nelson.

5
           4.  Most of the correspondence through this
6          office went through me as office manager.
           There was a constant flow of paper work to
7          and from McCormick, Barstow ... until 1996
           when the amount of representation by
8          McCormick, Barstow ... diminished, ending in
           1997.

9
           5.  Normally, Dwight Nelson, Charles Fletcher
10         and myself would attend these meetings.
           Marshall Whitney would have other attorneys
11         at McCormick, Barstow ... attend, depending
           on what matters he may have involved those
12         attorneys.  I felt the relationship with
           Marshall Whitney was close.

13
           6.  In addition to representing Lewis C.
14         Nelson and Sons, Inc., Marshall Whitney,
           beginning about 1987-1988, represented a
15         small construction company that I owned,
           Shar-Lyn Construction, Inc., until 1996.
16         Marshall Whitney, assisted by Stephen
           Carroll, represented Shar-Lyn Construction,
17         Inc. in a lawsuit against a city on a public
           works construction contract, and with respect
18         to a claim for overhead costs against a
           hospital district, and other matters.  I
19         freely and frankly discussed with Marshall
           Whitney all matters regarding the cases,
20         including litigation, strategy, and possible
           settlement of disputes, my concerns and
21         problems, in the same was done [sic] with
           Marshall Whitney regarding Lewis C. Nelson
22         and Sons, Inc., and Dwight G. Nelson.

23     Marshall Whitney has filed the following declaration in

24 opposition to this motion to disqualify:

25         2.  It is my recollection that various
           attorneys in my law firm have represented
26         Lewis C. Nelson and Sons ('LCN') ... from

                                10

approximately 1985 through 1995.  In approximately 1997 at the request of LCN and its president, Dwight G. Nelson, we surrendered to LCN and Mr. Nelson, all of our files reflecting our representation of Mr. Nelson, Lewis C. Nelson and Sons, and other companies in which Mr. Nelson has an ownership interest.

3.  In early 2000 at the request of Mr. Nelson, we destroyed all copies of our records reflecting our representation of LCN, Mr. Nelson, and companies with which Mr. Nelson was affiliated.  Accordingly, I do not have in my possession or control records to review which would reflect information that was imparted to my law firm by Mr. Nelson during our representation of him.  Therefore this declaration is submitted based upon my present recollection.

4.  It is consistent with my recollection that in 1985 the Honorable Oliver W. Wanger, formerly of our law firm, began representing LCN.  Some time around late 1986 or early 1987, I became the principal contact at my law firm for LCN and Mr. Nelson.

5.  Over the course of the approximate ten year period that my firm represented LCN and Mr. Nelson, I was my firm's principal contact with LCN and Mr. Nelson.  Based upon my contacts with LCN and Mr. Nelson, I was generally aware that my firm handled most of Mr. Nelson's and LCN's litigated and transactional matters during this time frame; however, we never received a retainer and I do not recall discussing that our firm was LCN's general counsel.

6.  In approximately, the late summer of 1995 I commenced the process of terminating the attorney-client relationship between my law firm and Mr. Nelson, LCN and his other companies.  By the fall of 1995, LEWIS C. NELSON AND SON, INC. [sic], had identified substitute counsel for all of their active files and to the best of my recollection, McCormick, Barstow ... was substituted out of all of LEWIS C. NELSON AND SON, INC.'s [sic] litigation matters during that time frame.

11

It is my recollection that any significant
construction cases of LEWIS C. NELSON AND
SON, INC. [sic] was [sic] transferred to his
current counsel, Robert Leslie of McInerney &
Dillon, at that time.  Formal termination of
our representation occurred in late 1995 or
early 1996.  It is my recollection that in
one matter for another entity owned by Mr.
Nelson, our representation was not formally
concluded until some time in 1996 or 1997.

7.  Since the fall of 1995, I do not recall
receiving any new engagements or assignments
from LCN, Mr. Nelson or any of his companies.
In fact, during that time frame a dispute
arose between my law firm and Mr. Nelson and
his various companies concerning a payment
for services and corresponding claims of
alleged professional negligence.

8.  On or about November 27, 1996, LCN and
Mr. Nelson and other affiliated companies
filed a Complaint against my firm, your
declarant and other members of the firm, and
in response my firm filed a Cross-Complaint
against Mr. Nelson and certain of his
companies seeking to recover fees for
services rendered which had not been paid.

9.  This lawsuit was settled in or about
February of 2000.  Shortly thereafter, as
indicated above, my firm destroyed all
records, to the extent if had any, arising
from our attorney-client relationship with
Mr. Nelson, LCN and his other companies.

10.  During the course of my representation
of LCN and Mr. Nelson, we worked directly
with Mr. Nelson and certain of his staff
including Charles P. Fletcher and Kathleen A.
Martin.  For the most part, during the first
5-7 years of my representation of LCN, Mr.
Nelson and his companies, I represented Mr.
Nelson and LCN in connection with
construction disputes with various owners and
sub-contractors.  However, by approximately
1992-1993, my representation for Mr. Nelson
shifted to unrelated matters involving his
automobile dealerships.  During that time
frame Stephen E. Carroll took on a more
dominant role in handling construction

12

disputes for Mr. Nelson.  Other lawyers in
the firm also represented Mr. Nelson and his
companies for other matters as indicated by
Mr. Nelson.

11.  It is consistent with my recollection
that Dwight Nelson and I did have several
confidential conversations regarding a host
of matters, and that our relationship evolved
into a close working relationship over the
course of years.  However, we never had a
social relationship per se, although my
memory is that on at least one and perhaps
more occasions I was invited to his company
Christmas party.

12.  When I began representing LCN and Mr.
Nelson, I did learn that Mr. Nelson had been
represented by a number of different
attorneys over the years and was experienced
in matters of litigation and settlement.
Without waiving any attorney-client
communication privileges that may exist, if
any, and in response to Mr. Nelson's
declaration at ¶ 5, I did advise and consult
with Charles Fletcher, Dwight Nelson and from
time to time, Kathleen Martin concerning
various lawsuits, claims and settlements, and
recommended courses of conduct.  I do not
recall ever developing with Mr. Nelson or LCN
any specific, generally applicable litigation
strategy that would be of uniform application
to subsequent cases other than the common
sense strategy of attempting to evaluate the
costs, benefits and risk associated with any
disputes, in order to achieve a fair and
reasonable compromised result, where
compromise is reasonably feasible.

13.  With respect to the issues presented to
this Court in this action, I can represent
that from time to time in the early 1990's I
did consult with LCN concerning issues
relating to sub-contractor replacement, and
on one, and perhaps two occasions, bid
protests involving LCN's bids on public
construction projects.  I have no memory of
the names of those projects or what the
specific issues were involving those cases.
I do not recall any of them involving
litigation.  Moreover, I have no recollection

13

of ever representing LCN, Mr. Nelson or any of his companies in connection with any constitutional challenges to the actions of a public entity.

14. I have no recollection of ever analyzing LCN's overhead and profit on any particular job and am unaware of any 'planned strategies regarding overhead and profit.' In fact, it is my recollection that when I was principally handling LCN's litigated matters, a large percentage of our cases for LCN were in defense of claims filed by sub-contractors. To the extent LCN had affirmative claims against sub-contractors or owners, I do not recall ever preparing an analysis of LCN's overhead and profit back in the 1980's and early 1990's either as to any project or generally.

15. I have no recollection or knowledge of what LCN's overhead and profit were on any project in any litigated matter that I handled on their behalf. I do not believe information relating to their overhead and profit was ever reviewed and analyzed by me or anyone at my office on behalf of LCN. I do not know whether or not their overhead and profit varied from project to project or what its components were. Further, I have not acquired nor have I had access to any information whatsoever regarding LCN's overhead and profit since late 1995. I am not aware of any facts suggesting and I have no reason to believe that what little financial information or data that may have been available to my law firm in the 1980's and early 1990's would have any bearing on the financial condition of LCN today, its efficiencies, its overhead or profit on the subject project or otherwise.

16. Mr. Nelson suggest that LCN still does things as I advised them (Nelson Declaration ¶ 5) I have no idea to what he refers, but I can represent to this Court that LCN did sue my firm, me and my partner Stephen Carroll and asserted, among other things that our representation of LCN and the legal advice we provided them fell below the standard of care. Our actions and recommendations were

14

challenged by LCN's present attorney, Robert
L. Leslie, who holds himself out as a
specialist in construction litigation.

17.   In response to ¶ 7 of Mr. Nelson's
Declaration, it is consistent with my memory
that I did prepare him for deposition and on
occasion defended him in these depositions,
but it is also my recollection that those
depositions involved legal and factual issues
that have no bearing whatsoever on the
constitutional issues associated with LCN's
claims asserted herein relative to the
subject juvenile detention center project.
Likewise, my representation of Mr. Nelson in
connection with his non-construction
businesses had no bearing whatsoever on the
construction activities of LCN which would in
any way have any relevance to the claims LCN
has asserted in this case.

18.   With respect to ¶ 8 of Mr. Nelson's
Declaration, Mr. Nelson and LCN and I did
have a close attorney-client relationship
which disintegrated in the Fall of 1995.
Prior to that time I represented Mr. Nelson
and LCN in a variety of contexts and it is
consistent with my memory that I attended
various court hearings for him, settlement
conferences, depositions, and business
meetings.  I also handled one or more
personal matters involving Mr. Nelson and his
wife which I do not feel I am at liberty to
delve into.  I can represent to this Court
that none of those matters of a personal
nature have any relevance whatsoever to the
legal or factual issues raised by LCN's
Complaint in this case.  They did not involve
construction projects, public bidding, or
constitutional claims on LCN's overhead or
projected project profits.

19.   I disagree with Mr. Charles Fletcher's
Declaration at ¶ 8 wherein he implies that we
obtained overhead and profit and projected
profit analysis in almost every
representation we conducted on LCN.  I have
no recollection of ever receiving any
detailed analyses of that information during
my representation of LCN.  In fact, during my
active representation of LCN there were very

15

few instances in which it took a position adverse to a public entity, since during that time, LCN's disputes on public projects typically were with its subcontractors and suppliers.  I do have a general and vague recollection that in the last year or two of our representation of LCN it began pursuing claims for delay damages and extended overhead and lost profits which were handled by Stephen Carroll of this office.  I do not know to what extent Mr. Carroll was provided information in that regard or when he was provided with such information.

21.  I have no recollection of what LCN's overheard, expenses, income, profits, profit margins or methods of allocating such overhead and expenses to any particular project.  I do not even know if LCN's analysis of such matters was undertaken manually or by computer.  Today I certainly do not know anything about its profitability generally or as to any particular project ro LCN's methods of calculating or allocating the same generally or as to any particular project.

22.  I have no knowledge of what the current organizational structure or chain of command might be at LCN.  At this juncture, I have no knowledge of who the current employees are of [LCN], except to the extent that that information has been disclosed in the declarations that have been filed in support of the subject Motion.

23.  I have no confidential knowledge of LCN's litigation or claims experience during the past ten years.

24.  Mr. Fletcher states in ¶ 10 of his Declaration that he and Dwight Nelson and I had discussions about claims and/or potential claims involving corporate alter ego. Without waiving the attorney-client privilege, if any remains, it is my recollection that those conversations were of a superficial nature and that I do not recall analyzing the issue with respect to LCN.  I further represent to this Court that I am unaware of any claim or potential claim that alter ego allegations

16

have any bearing whatsoever to LCN's claim
against the County of Fresno in this case.

25.  Kathleen Martin's Declaration regarding
my representation of Shan-Lyn Construction is
consistent with my recollection.  I do recall
that Shan-Lyn Construction was in a contract
dispute with a public entity and did have a
damage claim which I assume included its
project costs and overhead.  In my
representation of Kathleen Martin and Shan-
Lyn Construction we did discuss the various
items she refers to; however, I am unaware of
any facts or circumstances which would
suggest that Shan-Lyn Construction's profits,
overheard, or construction costs generally,
or allocable to that particular project, have
any bearing whatsoever on LCN's present claim
against the County of Fresno.

26.  Mr. Nelson suggests that I and Stephen
Carroll 'have confidential information about
me and Lewis C. Nelson and Sons, and others
at Lewis C. Nelson and Sons that they could
use in this case.'  As previously indicated,
all I or my law firm have at this time is in
our memories since all records of our long
past representation of LCN and Mr. Nelson
have been destroyed.  I do not have in my
possession, custody, control, or in my memory
any confidential information pertaining to
Mr. Nelson or LCN relating to any information
relevant to the subject matter of this
action, including but not limited to any
information relating to the financial
condition of LCN, its profits or losses, its
projected overhead on this project, its
projected profits, its current business
planning or strategies relating to this
project or otherwise, or its mode or method
of calculating its alleged losses in this
case or any other.  I am also unaware of any
'confidential' information that I presently
have or had access to when I represented LCN
10 years ago that would even be germane to
any issues presented by this case.

27.  Moreover, there never was any uniform
strategy, protocol, or procedure employed
during my representation of Mr. Nelson or LCN
regarding the prosecution and/or settlement

17

of claims, because it is my recollection that
each claim, whether assertive or defensive,
was evaluated and dealt with on a case by
case basis.

28.  Since I have not represented Mr. Nelson
for close to 10 years and have no documentary
evidence of his business affairs or those of
LCN, I neither have access to nor possess any
confidential information relating to LCN, its
financial condition, its overhead, its
profits or losses generally, how it computes
or allocates such expenses to a project, or
its projected profits on the subject juvenile
detention center.

29.  I respectfully submit that any financial
information, litigation strategies or any
'confidential [sic] that we had or may have
discussed with Mr. Nelson, Mr. Fletcher,
Kathleen Martin and/or LCN and its employees
10 to 20 years ago is no longer of any
significance or materiality because of the
substantial passage of time and the probable
significant changes in LCN's financial
dealings and structure during that period.

Stephen E. Carroll also has filed a declaration in opposition to

this motion to disqualify, averring in pertinent part:

3.  I have been employed by McCormick,
Barstow ... since 1984.  Since January of
1990, I have been a partner of McCormick,
Barstow ... Prior to late 1992, I had only
sporadic involvement in any of the legal
affairs of LCN ... Prior to that time, my
only involvement in the representation of LCN
was in connection with occasional research
assignments involving issues assigned to me
by my partner, Marshall C. Whitney.  Starting
in early 1993, I began to receive files
directly from LCN for which I was
responsible.  My involvement in the
representation of LCN continued until the
summer of 1995 at which time I made the
decision to discontinue my representation of
LCN.

4.  By the fall of 1995, LCN had identified
substitute counsel for all of their active

18

files and to the best of my recollection,
McCormick, Barstow ... was substituted out of
all of LCN's litigation matters during that
time frame.  It is my recollection that any
significant construction cases of LCN was
[sic] transferred to his current counsel,
Robert Leslie of McInerney & Dillon, at that
time.

5.  The vast majority of the legal services
which I provided to LCN involved actions in
which LCN was engaged in litigation with one
of its subcontractors on a project.  Although
the projects which gave rise to the
litigation in which I was representing LCN
typically involved a public improvement,
there were very few instances in which LCN
took a position adverse to a public entity,
at least during the period in which I was
representing them.  I can recall only two
matters in which the possibility of a claim
against a public entity arose, neither of
which were in a bidding context.  In
connection with a contract between LCN, the
claim against Greenfield Unified School
District was pending at the time that I
concluded my representation of LCN.  In a
second instance, the possibility of a claim
against the Clovis Unified School District
was under consideration by LCN, toward the
end of my representation of them.  This
matter was referred to Mr. Leslie and the law
firm of McInerney & Dillon, who I am given to
understand eventually filed a claim against
the Clovis Unified School District and
pursued it to final judgment.

6.  Any suggestion on the part of LCN that I
acquired an intimate knowledge of its
business operations, and in particular its
financial affairs, is simply wrong.  During
the course of my representation of LCN, I was
very much kept on a need-to-know basis with
regard to information and access to its
files.  During the course of my
representation of LCN I never even visited
its offices.  Instead, I would receive,
typically through Chuck Fletcher, copies of
those documents which LCN chose to give me
which related to the litigation being
referred to me.

19

7.   Even during the course of the preparation of the above-referenced claims against the Greenfield Unified School District and the Clovis Unified School District in 1994, I did not personally review the financial records of LCN in an attempt to establish the scope of its claim.  Rather, in both instances, an outside consultant was retained by LCN to review the records provided to him by Mr. Fletcher in an effort to calculate the damages to be claimed by LCN.

8.   Today I have no recollection of what records were reviewed in the course of the preparation of those claims, the methodology that was employed, the profitability or overhead of LCN, or even the records of LCN that were available and that bore on the issue of profitability or overhead at LCN. Other than in connection with those two claims, I have no recollection of having ever participated in any representation of LCN in which the issues of profitability or overhead ever evolved past being theoretical issues.

9.   At this time, I have no recollection of any specific facts, records, documents or information which in any way pertain to the business practices of LCN, the policies of LCN, the financial condition of LCN, or the particulars of the profitability or overhead of LCN.  I have no knowledge of what the current organizational structure or chain of command might be at LCN.  At this juncture, I have no knowledge of who the current employees are of LCN, except to the extent that that information has been disclosed in the declarations that have been filed in support of the subject Motion.

10.   I have no recollection of ever having represented LCN in connection with a bid protest whether in the role of defending the awarding of the bid to LCN, or objecting to the award of a contract to another bidder in competition with LCN.  In particular, I do not recall ever having filed any actions on behalf of LCN against any public entities in connection with a bidding dispute, or even having submitted a bid protest on behalf of LCN.

11.  I do not have any files of LCN and to my
knowledge neither does anyone at McCormick,
Barstow ... It is my understanding that
copies of all documents were destroyed as
part of the litigation between LCN and
McCormick ... and your declarant, among
others, which is referenced in the
Declaration of Marshall C. Whitney ....

B.  <u>Merits of Motion to Disqualify</u>.

This court has adopted the standards of professional conduct

required by members of the State Bar of California and contained

in the State Bar Act, the Rules of Professional Conduct of the

State Bar of California and decisions of any Court applicable

thereto.  Rule 83-180(e), Local Rules of Practice.

Of importance to the resolution of this motion are the

standards articulated by the Ninth Circuit in <u>Trone v. Smith</u>, 621

F.2d 994 (9th Cir. 1980):

The relevant test for disqualification is
whether the former representation is
'substantially related' to the current
representation ... The interest to be
preserved by preventing attorneys from
accepting representation adverse to a former
client is the protection and enhancement of
the professional relationship in all its
dimensions.  It is necessary to preserve the
value attached to the relationship both by
the attorney and by the client.  These
objectives require a rule that prevents
attorneys from accepting representation
adverse to a former client if the later case
bears a substantial connection to the earlier
one ... Substantiality is present if the
factual contexts of the two representations
are similar or related.

Perhaps the most important facet of the
professional relationship served by this rule
of disqualification is the preservation of
secrets and confidences communicated to the
lawyer by the client.  If there is a

21

reasonable probability that confidences were
disclosed which could be used against the
client in later, adverse representation, a
substantial relation between the two cases is
presumed.  Confidentiality, however, is not
the only aspect of the professional tie
preserved by the disqualification rule.

Both the lawyer and the client should expect
that the lawyer will use every skill, expend
every energy, and tap every legitimate
resource in the exercise of independent legal
judgment on behalf of the client and in
undertaking representation on the client's
behalf.  That professional commitment is not
furthered, but endangered, if the possibility
exists that the lawyer will change sides
later in a substantially related matter.
Both the fact and the appearance of total
professional commitment are endangered by
adverse representation in related cases.
From this standpoint it matters not whether
confidences were in fact imparted to the
lawyer by the client.  The substantial
relationship between the two representations
is itself sufficient to disqualify.

The rule we state is necessary to implement
the following canons of professional ethics:
Canon 1 (maintaining integrity and confidence
in the legal profession); Canon 4 (preserving
confidences and secrets of a client); Canon 5
(exercise of independent professional
judgment); Canon 6 (representing a client
competently); Canon 7 (representing a client
zealously with the bounds of the law); Canon
9 (avoiding even the appearance of
professional impropriety).

As we have stated, the underlying concern is
the possibility, or appearance of the
possibility, that the attorney may have
received confidential information during the
prior representation that would be relevant
to the subsequent matter in which
disqualification is sought.  The test does
not require the former client to show that
actual confidences were disclosed.  That
inquiry would be improper as requiring the
very disclosure the rule is intended to
protect ... The inquiry is for this reason

22

1                      restricted to the scope of the representation
                      engaged in by the attorney.  It is the

2                      possibility of the breach of confidence, not
                      the fact of the breach, that triggers

3                      disqualification.

4  621 F.2d at 998-999.  Furthermore, Rule 3-310(E), California

5  Rules of Professional Conduct, provides in pertinent part:

6                      A member shall not, without the informed
                      written consent of the ... former client,

7                      accept employment adverse to the ... former
                      client where, by reason of the representation

8                      of the ... former client, the member has
                      obtained confidential information material to

9                      the employment.

10  The California Courts impose essentially the same standards

11  articulated by the Ninth Circuit in Trone v. Smith in determining

12  whether a motion to disqualify pursuant to Rule 3-310(E) should

13  be granted.  See In re Marriage of Zimmerman, 16 Cal.App.4th 556

14  (1993):

15                      ... 'It is well settled that an attorney is
                      prohibited from doing either of two things

16                      after severing a relationship with a former
                      client. "' ... He may not do anything which

17                      will injuriously affect his former client in
                      any [matter] in which he formerly represented

18                      him nor may he at any time use against his
                      former client knowledge or information

19                      acquired by virtue of the previous
                      relationship.'" ... The purpose of the rule

20                      is to protect both confidential
                      communications and the enduring confidential

21                      relationship between attorney and client.
                      ....

22                      Where ... a motion for disqualification is

23                      predicated upon a claimed breach of
                      confidentiality or conflict of interest, the

24                      trial court must undertake a cautious
                      balancing of competing interests.  'The trial

25                      court must weigh the combined effect of a
                      party's right to counsel of choice, as

26                      attorney's interest in representing a client,

the financial burden of a client of replacing
disqualified counsel and any tactical abuse
underlying a disqualification proceeding
against the fundamental principle that the
fair resolution of disputes within our
adversary system requires vigorous
representation of parties by independent
counsel unencumbered by conflicts of interest
....

Thus, 'a former client may seek to disqualify
a former attorney from representing an
adverse party by showing that the former
attorney possesses confidential information
adverse to the former client ... The former
client need not establish that the attorney
actually possesses confidential information
... 'It is the possibility of the breach of
confidence, not the fact of an actual breach
that triggers disqualification ... Under the
'substantial relationship' test, subsequent
representation is proscribed on the theory
that its substantial relationship to the
former representation 'places the attorney in
a situation where he or she could breach the
duty of confidentiality to the former
client.' ... Possession of confidential
information is <u>presumed</u> where '"'a
substantial relationship has been shown to
exist between the former representation and
the current representation, and when it
appears by virtue of the nature of the former
representation or the relationship of the
attorney to his former client confidential
information material to the current dispute
would normally have been imparted to the
attorney ....'"' ... If the substantial
relationship test is satisfied by the former
client, '"... the discussion should
ordinarily end.  The rights and interests of
the former client will prevail.  Conflict
would be presumed; disqualification will be
ordered....'" ....

16 Cal.App.4th at 562-563.  <u>See also</u> <u>Civil Service Com. v.</u>
<u>Superior Court</u>, 163 Cal.App.3d 70, 79-80 (1984):

While the concept of confidentiality may be
the touchstone of adverse prior
representation analysis, other considerations

24

1
2
3
4
5
6
7
8
9
10
11
12

    are relevant as well.  Courts have long been concerned about the prospect of a swearing contest between the attorney and the former client as to whether the attorney had access to confidential information in the course of the prior representation.  To avoid this problem, the 'substantial relationship' test was developed: '[T]he former client need show no more than that the matters embraced within the pending suit wherein his former attorney appears on behalf of his adversary are substantially related to the matters or cause of action [where] the attorney previously represented him, the former client.  The Court will assume that during the course of the former representation confidences were disclosed to the attorney bearing on the subject matter of the representation.  It will not inquire into their nature and extent.  Only in this manner can the lawyer's duty of absolute fidelity be enforced and the spirit of the rule relating to privileged communications be maintained.

13
14
15
16
17
18
19

    'To compel a client, in addition to establishing that the subject of the present adverse representation is related to the former, the actual confidential matters previously entrusted to the attorney and their possible value in the present client [sic] would tear aside the protective cloak drawn about the lawyer-client relationship. For the Court to probe further and sift the confidences in fact revealed would require the disclosure of the very matters intended to be protected by the [confidentiality] rule.' ....

20  Finally, in <u>Jessen v. Hartford Casualty Ins. Co.</u>, 111 Cal.App.4th

21  698, 709-710 (2003), the court fine-tuned the substantial

22  relationship test:

23
24
25
26

    [W]hether an attorney should be disqualified in a successive representation case turns on two variables: (1) the relationship between the legal problem involved in the former representation and the legal problem involved in the current representation, and (2) the relationship between the attorney and the

former client with respect to the legal
problem involved in the former representation
... If the relationship between the attorney
and the former client is shown to have been
direct - that is, where the lawyer was
personally involved in providing legal advice
and services to the former client - then it
must be presumed that confidential
information has passed to the attorney and
there cannot be any delving into the
specifics of the communications between the
attorney and the former client in an effort
to show that the attorney did or did not
receive confidential information during the
course of that relationship.  As a result,
disqualification will depend upon the
strength of the similarities between the
legal problem involved in the former
representation and the legal problem involved
in the current representation.  This is so
because a direct attorney-client relationship
is inherently one during which confidential
information 'would normally have been
imparted to the attorney by virtue of the
nature of [that sort of] former
representation,' and therefore it will be
conclusively presumed that the attorney
acquired confidential information relevant to
the current representation if it is congruent
with the former representation ....

On the other hand, where the former attorney-
client relationship is peripheral or
attenuated instead of direct, then the
presumption will not be applied in the
absence of an adequate showing that the
attorney was in a position vis-a-vis the
client to likely have acquired confidential
information material to the current
representation.  In these circumstances, the
relationship between the compared
representations shares equal billing with the
relationship between the attorney and the
former client and the two aspects of the
Ahmanson test are assessed in combination in
determining whether disqualification is
mandated.

1.   Material Confidential Information.

Plaintiff argues that disqualification is required because

26

1  Messrs. Whitney and Carroll obtained material confidential

2  information during their representation of plaintiff which can be

3  used to diminish plaintiff's ability to prevail in this action.

4  In so arguing, plaintiff is not relying on the substantial

5  relationship test described above and discussed in more detail

6  infra.  Plaintiff asserts that the presumption that the former

7  attorneys possess confidential information where there is a

8  similarity between the representations is inapplicable where the

9  former attorneys admit that they possess confidential

10 information.  Plaintiff contends that once the former attorneys

11 admit that they possess confidential information, all plaintiff

12 has to demonstrate is that if this confidential information is

13 used in the present litigation [it] would place the former client

14 at an unfair advantage.  In so asserting, plaintiff cites to

15 Johnson v. Superior Court, 159 Cal.App.3d 573 (1984).

16     Plaintiff's position is not well-taken.  Johnson merely

17 articulates another version of the substantial relationship test.

18 The decision notes that the record failed to establish any

19 substantial relationship between the two representations.  It was

20 argued that a former client need not prove actual possession of

21 confidential information to obtain an attorney disqualification.

22 However, the court noted that the possession of confidential

23 information will be presumed only where a substantial

24 relationship between the two representations has been shown and

25 where it appears that by virtue of that relationship confidential

26 information material to the current dispute would have been

27

imparted to the attorney.  The court then discussed and rejected
the assertion that disqualification is required if the former
attorney obtained special knowledge of his client's affairs.  In
rejecting this position, the court stated that "what must be
shown is that the attorney has obtained as a result of the
earlier representation knowledge of otherwise confidential
information that if used in the present litigation would place
the former client at an unfair advantage."  The court went on to
hold that this had not been shown in the case.  Obviously, if it
is shown that McCormick Barstow obtained confidential information
directly relevant to issues before the court in this action,
whether or not the two representations were substantially related
goes by the boards.  However, the fact that confidential
information was obtained during a prior representation does not
ipso facto require disqualification if that confidential
information has no relationship to the present representation.
The purpose of the substantial relationship test is to protect
the confidence, so to speak, of that information.  Otherwise, a
disqualification could be based on the fact that confidential
information was obtained during a patent lawsuit even though the
present representation involves a divorce.

Plaintiff that disqualification is required under this
standard because both Mr. Whitney and Mr. Carroll learned a great
deal of confidential information during their representation of
plaintiff, including matters involving plaintiff's internal
organization structure, it's personnel, areas of inquiry

sensitive to plaintiff, who employed by plaintiff is likely to possess facts about this lawsuit, how plaintiff keeps its records and what might be in them, and what factors plaintiff relies on in deciding whether to settle an action.

However, as defendant contends, plaintiff's legal conclusions about confidentiality are of no value in resolving this motion.  As defendant argues, the "declarations offered in support ... neither identify any legitimate factual or legal similarities between the antecedent and current representations, nor do they attempt to identify any rational connection or nexus between the antecedent and current representations."  The fallacy of plaintiff's claim is demonstrated by the conclusory claim that Mr. Whitney advised plaintiff "how to look at and consider litigation and settlement, and the methods and parts and pieces of legal matters" and that "[w]e still do things as advised by Marshall Whitney."  Plaintiff sued McCormick, Barstow for legal malpractice, being represented in that action by Mr. Leslie, counsel for defendants in this action, a specialist in construction litigation.  As defendant asserts: "Surely Plaintiff cannot accurately represent to the Court that it still follows advice that it and its present attorney asserted was sufficiently deficient to support a claim for malpractice."  Finally, the confidences and secrets alluded to by plaintiff  are irrelevant to the present dispute and no material connection between the former and present representations has been established.  For example, plaintiff's averments concerning discussions on the

issue of alter ego is not relevant to the plaintiff's claims of

denial of equal protection and due process at issue in this

action. To the extent that plaintiff generally contends that

McCormick, Barstow was generally privy to information such as

litigation and settlement strategies and the organizational

structure of the various companies, defendant argues:

> Entirely missing from this conclusory
> analysis is any attempt by Plaintiff to draw
> a connection between McCormick, Barstow's
> alleged knowledge of these policies gained
> from the former representation (assuming such
> policies in fact existed and were
> communicated to McCormick Barstow) and its
> materiality to the present dispute.  The
> reason for this omission ... is Plaintiff
> cannot make any such connection.

The court agrees.  In Farris v. Fireman's Fund Ins. Co., 119

Cal.App.4th 671 (2004), the Court of Appeal discussed a prior

decision, Jessen v. Hartford Casualty Insurance Company, supra.

Both of these cases were substantial relationship cases.  In

Jessen, the court had stated that successive representations will

be substantially related "when the evidence before the trial

court supports a rational conclusion that information material to

the evaluation, prosecution, settlement or accomplishment of the

former representation given its factual and legal issues is also

material to the evaluation, prosecution, settlement or

accomplishment of the current representation given its factual

and legal issues." Jessen, 111 Cal.App.4th at 712.  In Farris,

the Court of Appeal explained in pertinent part:

> ... Jessen did not adopt the so-called
> 'playbook' approach ... To create a conflict

requiring disqualification, <u>Jessen</u> mandates
that the information acquired during the
first representation be 'material' to the
second; that is, it must be found to be
directly at issue in, or have some critical
importance to, the second representation.
Thus, for example, the attorney's acquisition
during the first representation of general
information about the first client's 'overall
structure and practices' would not of itself
require disqualification unless it were found
to be 'material' - i.e., directly at issue or
of critical importance - in the second
representation ... The same is true about
information such as the first client's
'litigation philosophy' or 'key decision
makers.'  Our reference to these and other
factors in <u>Jessen</u> did not establish any one
of them, singly or in any particular
combination, as a litmus test; we simply
identified some of the categories of
information that might be found to be
'material' and therefore relevant to a
determination whether the attorney ought to
be disqualified.  For these reasons, we do
not regard <u>Jessen</u> as creating a lifetime
prohibition against representation adverse to
a former client, treating the former client
in the same fashion as a current client, or
automatically mandating disqualification
where the two compared matters are entirely
unrelated.

<u>Farris</u>, 199 Cal.App.4th at 630.  Defendant argues:

... Plaintiff has failed to provide any
specifics whatsoever regarding the former
representations so as to allow the Court to
assess whether the present lawsuit is
substantially related to those past
representations.  Thus, Plaintiff's wholesale
reliance on the 'playbook' approach - without
any showing how such knowledge of 10 to 20
year old 'strategies' similarly relate to the
antecedent and current representations - is
legally ineffective.  This failure of proof
renders it absolutely impossible for
Plaintiff to establish that McCormick
Barstow's alleged acquisition of Plaintiff's
litigation philosophies, identity of key
decision makers and overall corporate

31

structure is in any way material to the
present action.

Consequently, the court concludes that plaintiff has not established that Mr. Whitney and Mr. Carroll obtained material confidential information during their representation of plaintiff which can be used to diminish plaintiff's ability to prevail in this action.

2.   Substantial Relationship Test.

Plaintiff further argues that the substantial relationship test mandates the granting of this motion, noting that the courts consider three factors in making this determination: "(1) the factual similarities between the current and former representations, (2) the similarities in the legal questions posed, and (3) the nature and extent of the attorney's involvement with the former representation." Dieter v. Regents of University of California, 963 F.Supp. 908, 912 (E.D.Cal. 1997).

It is undisputed that both Mr. Whitney and Mr. Carroll had a direct relationship with plaintiff.

Plaintiff contends that the basis of this lawsuit is that defendant retaliated against plaintiff for the exercise of plaintiff's First Amendment right to petition the government. Plaintiff argues that there are "factual connections" between this lawsuit and the prior representations by Mssers Whitney and Carroll.   Plaintiff asserts that Messers Whitney and Carroll received confidential information from it regarding government

32

1  contracts and government bidding cases and represented plaintiff

2  in matters involving government bidding disputes and

3  subcontractor disputes on numerous public works projects.  In

4  addition, plaintiff notes that Mr. Carroll represented plaintiff

5  in litigation with other governmental entities.  Plaintiff

6  contends that both the current representation and the prior

7  representations concerned the overhead and profit of LCN,

8  including how LCN calculates overhead and its profit margins on

9  contracts, confidential information relevant to LCN's calculation

10  of damages in this case.  Plaintiff argues:

11            [LCN's] historical overhead and profit were
              involved in many cases where [LCN] was
12            represented by ... Whitney and ... Carroll in
              claims and disputes with public entities ...
13            [LCN's] damages in this lawsuit include its
              lost future overhead and lost future profits
14            from work denied to it ... Calculation of
              future damages are typically based on prior
15            performance, confidential communications of
              which are held by Mr. Whitney, Mr. Carroll
16            and McCormick, Barstow.

17  Plaintiff also argues that Mr. Whitney repeatedly advised LCN on

18  how to look at and consider litigation and settlement and "the

19  methods and parts and pieces of legal matters."  Plaintiff

20  contends that its still does some things as advised by Mr.

21  Whitney.  Plaintiff contends that Messers. Whitney and Carroll

22  are familiar with the factors LCN employs in deciding whether to

23  settle litigation and are familiar with LCN's litigation

24  philosophy, LCN's overall organization structure and practices,

25  and know the identity of the key decision-makers at LCN.

26

1  Plaintiff further argues that there are similar legal issues
2  between the past and current representations because this case
3  involves public bidding and whether the County of Fresno
4  considered improper factors in denying plaintiff's bid.

5       However, as defendant argues, the constitutional dispute at
6  issue before the court is not substantially related to McCormick
7  Barstow's former representation of Plaintiff.  The action before
8  the court is not a bid protest involving the challenge or defense
9  of public contract bid requirements.  Plaintiff concedes in its
10 complaint that its bid was not in compliance.  Nor does this
11 action involve the performance of a public contract or the
12 performance by subcontractors.  The court concurs with defendant
13 that the only relationship between this action and the prior
14 representation of plaintiff is the fact that underlying this
15 constitutional challenge to the decision by defendant is an
16 unsuccessful public contract bid.  Plaintiff's argument that the
17 substantial relationship test is satisfied because Mr. Whitney
18 and Mr. Carroll gave advice to plaintiff concerning the
19 litigation of government contract cases and participated in cases
20 in which the formulation and calculation of overhead and lost
21 profits were made is not persuasive given the substantial amount
22 of time that has elapsed since the prior representation ceased.
23 The court agrees with defendant that financial information from
24 dating before the prior representation ceased is not even
25 tenuously related to plaintiff's present claim for lost profit
26 damages and overhead.

34

1    Consequently, the court concludes that the factors relevant

2  to a resolution of the substantial relationship test for

3  disqualification of prior counsel do not mandate disqualification

4  of Mr. Whitney and Mr. Carroll from defending the County of

5  Fresno in the instant action.

6    ACCORDINGLY:

7    1.  Plaintiff's Motion to Disqualify Marshall C. Whitney,

8  Stephen E. Carroll, and McCormick, Barstow, Sheppard, Wayte &

9  Carruth as Counsel is denied.

10    IT IS SO ORDERED.

11  **Dated:  October 7, 2005**          **____/s/ Robert E. Coyle____**
    668554                             UNITED STATES DISTRICT JUDGE

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26